**SIGNED this 29th day of January, 2009.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

```
IN RE:                                )
                                      )
SPILLMAN DEVELOPMENT GROUP, LTD.      ) CASE NO. 05-14415-FM
                 DEBTOR               ) (Chapter 7)
_____)_____
                                      )
SPILLMAN INVESTMENT GROUP, LTD.,      )
STEPHEN W. GURASICH, JR.,             )
DONALD C. WALDEN, ROBERT H. WEST,     )
MORTON L. TOPFER, ALAN TOPFER,        )
AND RICHARD TOPFER                    )
                 PLAINTIFFS           )
VS.                                   ) ADVERSARY NO. 08-1018
                                      )
AMERICAN BANK OF TEXAS,               )
RONALD E. INGALLS, TRUSTEE,           )
AND FIRE EAGLE, LLC                   )
                 DEFENDANTS           )
                                      )
RONALD E. INGALLS, TRUSTEE,           )
     Third-Party Plaintiff            )
                                      )
VS.                                   )
                                      )
PALISADES DEVELOPERS, LTD.,           )
     Third-Party Defendant            )
```

1

## MEMORANDUM OPINION

Plaintiffs filed their Motion for Summary Judgment against Defendants on November 3, 2008.  Defendant, Fire Eagle, LLC, filed its Motion for Summary Judgment on December 2, 2008.  Both Motions require a determination of the legal effect of Fire Eagle's credit bid purchase of assets of Debtor, Spillman Development Group, Ltd., in a §363 sale conducted by this Court.  As such, this Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) and (b)(1), 28 U.S.C. §151 and the Standing Order of Reference of all bankruptcy related matters by the United States District Court, Western District of Texas.  Although this proceeding involves claims of third parties against Fire Eagle, this is a core proceeding as the claims are dependent upon interpretation of rights created in bankruptcy specifically those rights associated with §363 of the Bankruptcy Code.  *In re Stonebridge Technologies, Inc.,* 430 F.3d 260 (5th Cir. 2005).[1]  This Memorandum Opinion is being issued in accordance with Bankruptcy Rule 7056 as a statement regarding material facts not in genuine dispute and conclusions of law based thereon.

---

[1] See Memorandum Opinion and Order of this Court in this proceeding entered September 2, 2008 finding this matter to be a core proceeding and holding that this Court has subject matter jurisdiction.

## **Background**

The Plaintiffs instituted this adversary proceeding seeking a determination of the legal effect of a sale of certain of the Debtor's estate's assets in open court pursuant to Final Order of this Court entered in the primary case in which this adversary pends. Specifically, Plaintiffs seek a determination as to the extent to which, if any, certain guarantees of the individual Plaintiffs and a certificate of deposit pledged by Spillman Investment Group, Ltd. still secure the first lien indebtedness which was also secured by the assets so sold. This debt was held on the Petition Date by American Bank of Texas, but as of the date of the sale, November 30, 2006, it had been purchased by and transferred to Fire Eagle LLC, the holder of the second lien indebtedness against the assets sold.

Plaintiff Spillman Investment Group, Ltd. alleges it had pledged a certificate of deposit in the amount of $1,200,000.00 to American Bank of Texas as collateral for the first lien debt and seeks a ruling by this Court that the effect of Fire Eagle LLC's $9.3 million credit bid was to fully pay the first lien indebtedness it had purchased from American Bank of Texas and that the certificate of deposit it had placed as security for that debt should now be released back to it.

Plaintiffs Gurasich, Walden, West, and the three Topfers allege they were guarantors of the first lien debt which Fire

Eagle, LLC bought from American Bank of Texas and seek a ruling that the legal effect of the credit bid sale to Fire Eagle was that the first lien indebtedness was fully paid and that their guarantees should be determined to be released and ordered returned to them.

The foregoing relief is sought under the Federal Declaratory Judgment Law as is contained in 28 U.S.C. § 2201-2202.

The Complaint also contains a request for attorney's fees under § 37.009 of the Texas Civil Practice and Remedies Code.  The allegation is that such relief has also been requested by Plaintiffs in an interpleader action instituted by American Bank of Texas on October 10, 2006 in the District Court of Travis County, Texas, 201st Judicial District Court, under Cause No. D-GN-06003885. There is a fourth cause of action requesting damages and attorney's fees against Fire Eagle for an alleged breach of contract, to-wit: failure to release the certificate of deposit and the guarantees after the debt was paid which is not the subject of Plaintiffs' Motion for Summary Judgment.

To all of that Fire Eagle filed its Rule 12(b) Motion to Dismiss on April 11, 2008.  Such Motion was denied on September 2, 2008.  Fire Eagle filed a Motion for Leave to Appeal which was denied by the United States District Court on November 6, 2008.

Fire Eagle has answered and both parties have filed Motions for Summary Judgment alleging there are no issues of material fact

4

but which are contested each by the other on legal grounds.  The Motion of Plaintiffs is for Partial Summary Judgment on one discreet issue.  Fire Eagle's Motion likewise addresses the same issue.

## Facts

The following facts are without genuine dispute and the documents where noted as Plaintiffs' Motion for Summary Judgment Exhibits are evidence used by both Plaintiffs and Fire Eagle in their cross Motions.

For the purposes of identification, the parties referred to are Spillman Development Group, Ltd. ("Debtor" or "SDG"), Spillman Investment Group, Ltd. ("SIG"), Steven W. Gurasich, Jr. ("Gurasich"), Donald G. Walden ("Walden"), Robert H. West ("West"), Morton L. Topfer, Richard Topfer, Alan Topfer (collectively the "Topfers"), American Bank of Texas ("ABT"), Ronald E. Ingalls ("Chapter 7 Trustee") and Fire Eagle, LLC ("Fire Eagle").

1.   ABT, as Senior Lender, and Fire Eagle, as Junior Lender, entered into an Inter-Creditor Agreement ("Inter-Creditor Agreement") October 29, 2001.  The Inter-Creditor Agreement defined the relationship and creditor rights of ABT, which was to provide a loan for $7,200,000.00 ("the Senior Loan") to SDG and Fire Eagle which was to provide a loan of $4,100,000.00 ("the Junior Loan") to SDG all for the development of an 18-hole golf course, clubhouse and related facilities and amenities in Bee Cave, Texas located on

5

property more particularly described in The Inter-Creditor Agreement.

2.  Thereafter, SDG, as Borrower, and ABT, as Lender executed a Development Loan Agreement ("Loan Agreement") effective November 20, 2001.  Plaintiffs' MSJ Exhibit 1.

3.  Pursuant to the terms of the Loan Agreement, SDG executed a Promissory Note ("First Note") dated November 20, 2001, in the original principal sum of $7,200,000.00 and payable to the order of ABT.  Plaintiffs' MSJ Exhibit 2.

4.  Payment of the First Note was secured by a Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Deed of Trust") entered into as of November 20, 2001, executed by SDG for the benefit of ABT, and covering Land, Ground Lease, Fixtures, Improvements, Personalty, Contracts, Leases and Rents as therein described.  Plaintiffs' MSJ Exhibit 3.

5.  The security interest in personal property retained in the Deed of Trust was perfected by the filing of a UCC Financing Statement in the Official Public Records of Travis County, Texas, on November 21, 2001.

6.  The security interest in personal property retained in the Deed of Trust was also perfected by the filing of a UCC Financing Statement with the Texas Secretary of State on November 26, 2001.

7.  The UCC Financing Statement was re-recorded with the Texas Secretary of State to complete the legal description attached thereto on January 7, 2002.

6

8.    Payment of $2,786,160.00 of the principal of the First Note was guaranteed by Gurasich pursuant to the terms of a Limited Guaranty executed as of November 20, 2001 by Gurasich. ("Gurasich Limited Guaranty of the First Note"). Plaintiffs' MSJ Exhibit 24.

9.    Payment of $971,280.00 of the principal of the First Note was guaranteed by Walden pursuant to the terms of a Limited Guaranty executed as of November 20, 2001, by Walden ("Walden Limited Guaranty of the First Note"). Plaintiffs' MSJ Exhibit 25.

10.    On or about April 1, 2002, SIG provided SDG with $1,200,000.00.  This transaction was evidenced by a promissory note ("CD Note") dated April 1, 2002, in the original principal sum of $1,200,000.00 executed by SDG and payable to the order of SIG.  The CD Note provided that it would be payable in full on May 7, 2003. Plaintiffs' MSJ Exhibit 4.

11.    On or about April 1, 2002, SDG used the $1,200,000.00 obtained from SIG to purchase a certificate of deposit ("SDG CD") in the amount of $1,200,000.00 from ABT, being Certificate of Deposit Account No. 98117250.  This certificate of deposit was used to collateralize the First Note with ABT pursuant to the Loan Agreement.  The SDG CD had a maturity date of May 20, 2003. Plaintiffs' MSJ Exhibit 5.

12.    Payment of the First Note was further secured by an Assignment and Pledge of Deposits ("SDG Assignment") executed April 1, 2002 by SDG in favor of ABT covering all of SDG's right, title and interest in the SDG CD.

7

13.   The Loan Agreement was amended by a First Amendment to Development Loan Agreement ("First Amended Loan Agreement") entered into effective May 30, 2002, by SDG as Borrower and ABT as Lender. The First Amended Loan Agreement, among other changes, changed the guarantors to Bischoff (not a party to this action) Gurasich, Walden, West and the Topfers and changed the requirement for a certificate of deposit from $2,700,000.00 to $1,200,000.00.

14.   Gurasich executed an Amended and Restated Limited Guaranty ("Amended Gurasich Limited Guaranty of the First Note") dated May 30, 2002, which amended the Gurasich Limited Guaranty of the First Note to limit Gurasich's guaranty of the First Note to principal of $2,000,000.00.  Plaintiffs' MSJ Exhibit 26.

15.   Walden executed an Amended and Restated Limited Guaranty ("Amended Walden Limited Guaranty of the First Note") dated May 30, 2002, which amended the Walden Limited Guaranty of the First Note to limit Walden's guaranty of the First Note to principal of $950,000.00.  Plaintiffs' MSJ Exhibit 27.

16.   West executed a Limited Guaranty ("West Guaranty of the First Note") dated May 30, 2002, by which West guaranteed $750,000.00 of the principal of the First Note. Plaintiffs' MSJ Exhibit 28

17.   The Topfers executed a Limited Guaranty ("Topfer Limited Guaranty of the First Note"), dated May 30, 2002, by which the Topfers collectively guaranteed $1,500,000.00 of the principal of the First Note.  Plaintiffs' MSJ Exhibit 29.

18.  SDG, as Borrower, and ABT, as Lender, entered into a Loan Modification Agreement ("Loan Modification Agreement"), effective September 16, 2002, for the purpose of removing certain real property and adding certain real property covered by the Deed of Trust.  Plaintiffs' MSJ Exhibit 7.

19.  Effective April 10, 2003, SDG, as Borrower, and ABT, as Lender, entered into a Second Amendment to Development Loan Agreement and Amendment of First Note ("Second Amended Loan Agreement"), pursuant to which the term "Note" as used in the Development Loan Agreement was defined to mean the First Note and that certain promissory note of even date therewith in the maximum principal amount of $900,000.00 ("Second Note").  Plaintiffs' MSJ Exhibit 8.

20.  Pursuant to the terms of the Second Amended Loan Agreement, SDG executed a Promissory Note ("Second Note") dated April 10, 2003, in the original principal sum of $900,000.00 and payable to the order of ABT.  Plaintiffs' MSJ Exhibit 9.

21.  Payment of the Second Note was secured by a Subordinate Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing (Second Deed of Trust) entered into as of April 10, 2003, executed by SDG for the benefit of ABT and covering Land, Ground Lease, Fixtures, Improvements, Personalty, Contracts, Leases and Rents as therein described.  Plaintiffs' MSJ Exhibit 10.

22.  Payment of the First Note and Second Note was further secured by a Second Subordinate Deed of Trust, Security Agreement,

Assignment of Leases and Rents and Fixture Filing ("Second Subordinate Deed of Trust") entered into as of April 10, 2003, executed by SDG for the benefit of ABT covering Land, Ground Lease, Fixtures, Improvements, Personalty, Contracts, Leases and Rents, as therein described. Plaintiffs' MSJ Exhibit 11.

23. Payment of $596,000.00 of the principal of the Second Note was guaranteed by Gurasich pursuant to the terms of a Limited Guaranty executed as of April 10, 2003, by Gurasich ("Gurasich Limited Guaranty of the Second Note"). Plaintiffs' MSJ Exhibit 30.

24. Payment of $147,000.00 of the principal of the Second Note was guaranteed by West pursuant to the terms of a Limited Guaranty executed as of April 10, 2003, by West ("West Limited Guaranty of the Second Note"). Plaintiffs' MSJ Exhibit 31.

25. Payment of $304,000.00 of the principal of the Second Note was guaranteed by the Topfers pursuant to the terms of a Limited Guaranty executed as of April 10, 2003, by the Topfers ("Topfer Limited Guaranty of the Second Note"). Plaintiffs' MSJ Exhibit 32.

26. ABT, as Senior Lender, and Fire Eagle, as Junior Lender, entered into a First Modification of Inter-Creditor Agreement ("Amended Inter-Creditor Agreement") as of April 10, 2003. Pursuant to the terms of the Amended Inter-Creditor Agreement, Fire Eagle agreed that the Senior Loan would be increased by an additional $900,000.00.

27.  After the SDG CD Note became due according to its terms in May, 2003, SDG paid off the note by transferring the SDG CD to SIG.  Thereafter, ABT issued a certificate of deposit for $1,200,000.00 to SIG ("SIG CD"), being Certificate of Deposit Account No. 98117250 which was then used to collateralize the First Note and Second Note with ABT.  The SIG CD provides on its face that it is "NON TRANSFERABLE – NON NEGOTIABLE".  Plaintiffs' MSJ Exhibit 13.

28.  Payment of the First Note and Second Note was further secured by an Assignment and Pledge of Deposits ("SIG Assignment") executed October 23, 2003, by SIG in favor of ABT covering all of SIG's right, title and interest in the SIG CD.  Plaintiffs' MSJ Exhibit 15.

29.  SDG, as Borrower, and ABT, as Lender, entered into a Modification and Extension Agreement ("Modification Agreement"), effective November 24, 2003, whereby the maturity of the First Note and Second Note was extended to November 20, 2008.

30.  SDG, as Borrower, and ABT, as Lender, entered into a Second Modification and Extension Agreement ("Second Modification Agreement"), effective March 20, 2005, further modifying the terms of the First Note and Second Note.

31.  Using the funds borrowed from ABT and Fire Eagle and equity contributions from the partners, SDG developed and operated a golf course generally known as the Falcon Head Golf Course (the "Course").  The Course is a PGA sanctioned course.

11

32.  Plaintiffs allege that unanticipated competition reduced the revenue per round and reduced the rounds per day realized by the Course.

33.  SDG lost an arbitration proceeding with Phillips & Jordan, Inc. ("P & J") which cost SDG several hundred thousand dollars in legal fees and resulted in a judgment against SDG for in excess of $800,000.00.

34.  As a result, SDG was unable to pay debt service to ABT and Fire Eagle.  SDG filed Chapter 11 on August 1, 2005, to avoid foreclosure and/or execution on its assets and to preserve the operating value of the Course by continuing its operation in the Chapter 11.

35.  On April 24, 2006, SDG filed Debtor's Motion for Orders (A)(i) Approving Sales Procedures in Connection with the Proposed Sale of Real Estate, (ii) Establishing Procedure for Fixing Cure Amounts, and (iii) Scheduling a Hearing to Consider Approval of Such Auction and Cure Amount Procedures and Prescribing the Form and Manner of Notice with Respect Thereto and (B)(i) Authorizing and Approving the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Executory Contacts and Unexpired Leases, and (iii) Granting Related Relief ("363/365 Motion").  The 363/365 Motion is docket entry 69 in the Bankruptcy Case.

36.  Fire Eagle objected to Debtor's 363/365 Motion and filed a plan of reorganization on May 15, 2006.

37.  On June 7, 2006, the Court signed an Order (i) Approving Sales Procedures in Connection with the Proposed Sale of Substantially All of the Debtor's Assets and the Assumption and Assignment of Executory Contracts and Leases and Prescribing the Form and Manner of Notice with Respect Thereto.  This Order set out a procedure whereby Debtor was authorized to solicit bids for the sale of substantially all of Debtor's property pursuant to 11 U.S.C. §§363 and 365.  The Order is docket entry 93 in the Bankruptcy Case.

38.  SDG filed its plan of reorganization on June 14, 2006.

39.  On September 18, 2006, the Board of New Orleans Fire Fighters' Pension and Relief Fund ("NOFF") approved the purchase of the First Note and Second Note from ABT.  The purchase was to be perfected through Fire Eagle but funded by NOFF.  NOFF is the sole member of Fire Eagle.

40.  Fire Eagle's purchase of the First Note and Second Note from ABT was documented by an Assignment of Notes and Liens, executed by ABT, as Assignor.  Plaintiffs' MSJ Exhibit 16.

41.  In connection with Fire Eagle's purchase of the First Note and Second Note from ABT, ABT, as Assignor, and Fire Eagle, as Assignee, executed an Assignment Agreement – Senior Loan Documents ("Assignment Agreement") effective October 6, 2006.  Plaintiffs' MSJ Exhibit 17.

13

42.    In the Assignment Agreement, ABT and Fire Eagle stipulated that the outstanding balances on the First Note and the Second Note, as of September 26, 2006, were as follows, respectively:

|  | Note No. 9646418 | Note No. 9713980 |
|---|---|---|
| E... | | |
| Principal | $7,187,564.10 | $854,510.13 |
| Interest | 789,652.69 | 94,522.82 |
| Legal Fees & Exp. | 197,368.92 | (Included in prior entry) |
| Total | $8,174,585.70 | $949,032.05 |

The Assignment Agreement further provided that:

"F.    Until payment of the purchase price hereunder is made in full, interest shall continue to accrue on the unpaid principal amount at the rates authorized by the Senior Loan Documents and attorneys' fees and expenses will also be incurred, all of which will be part of the purchase price.  The per diem accrual of interest on the unpaid principal amounts of each Note respectively is $1,896.72 and $225.50.  Recitals E and F comprise the Purchase Price."

43.    In the Assignment Agreement, ABT assigned to Fire Eagle all of ABT's right, title and interest in and to the Senior Loan Documents, defined therein to include the "Non-Negotiable Certificate of Deposit ($1,200,000.00) CD #98119089 of Spillman Investment Group, Ltd. and related records."  The "Non-Negotiable" SIG CD was, however, never negotiated to the order of or delivered to Fire Eagle.

44.    On October 10, 2006, ABT filed a Petition in Interpleader, designated Cause No. D-1-GN-06003885, in the District Court of Travis County, Texas 201st Judicial District ("Interpleader Lawsuit").  In the Interpleader Lawsuit, ABT alleged that both SIG and Fire Eagle claimed the SIG CD and its proceeds and asked the

14

District Court to release and discharge ABT from any further obligation with regard to the SIG CD.

45.    Confirmation of Debtor's plan of reorganization was denied on October 26, 2006, after the conclusion of the confirmation hearing.   Fire Eagle's plan of reorganization was voluntarily withdrawn by Fire Eagle on October 31, 2006, after it became obvious to Fire Eagle that its plan was not confirmable.

46.    On October 30, 2006, SDG filed Debtor's Motion to Modify Sales Procedures and Approve Sale of Property Free and Clear of Liens, Claims and Interest, and to Approve Assumption and Assignment of Executory Contracts ("Motion to Modify Sales Procedures") and on October 31, 2006, Debtor filed its Amended Motion to Modify Sales Procedures.   The Motion to Modify Sales Procedure and Amended Motion to Modify Sales Procedures are docket entries 287 and 289 respectively in the Bankruptcy Case.

47. On November 2, 2006, the Court held a hearing on Debtor's Motion to Modify Sales Procedures, at which time the Court established a bid procedure by which the assets of Debtor would be sold.   A transcript of this hearing is docket entry 418 in the Bankruptcy Case.

48.    On or about November 3, 2006, Fire Eagle filed Defendant's Original Answer and Cross Claim ("Fire Eagle's Answer and Cross Claim") in response to the Interpleader Lawsuit, seeking recovery of the SIG CD and its proceeds and damages and attorneys fees.

49.  On November 6, 2006, SIG filed Spillman Investment Group, Ltd.'s Answer and Cross-Claim ("SIG Answer and Cross Claims") in response to the Interpleader Lawsuit, seeking recovery of the SIG CD and its proceeds and attorneys fees pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code.

50.  On November 30, 2006, the Court considered bids for the sale of Debtor's property pursuant to the ruling previously made. At the hearing, the Court accepted a winning bid of $9,300,000.00 made by Fire Eagle (the "Sale").  Fire Eagle did not pay any funds towards the payment of the $9,300,000.00 bid.  Rather, the bid by Fire Eagle consisted entirely of a credit bid which the Court stated on the record was to be applied first against the first lien debt, that being the First Note and Second Note purchase from ABT (Senior Loan as defined herein).  In addition, the terms of the Sale included Fire Eagle's assumption of certain executory contracts and the obligation to cure defaults under such contracts. One such contract assumed by Fire Eagle was the contract with the Lower Colorado River Authority (LCRA) which was in default in an amount in excess of $800,000.00.  A transcript of this hearing is docket entry 417 in the Bankruptcy Case.

51.  An Agreed Order Approving Sale of Assets was entered December 7, 2006, which Order is now final and non-appealable. (Docket No. 354).

16

52.    On December 19, 2006, SDG filed Debtor's Motion to Determine Deficiency Claim Held by Fire Eagle, LLC and Objection to Claim.  This Motion is docket entry 359 in the Bankruptcy Case.

53.  On April 4, 2007, the Court converted the Bankruptcy Case to a Chapter 7 case.  Thereafter, Ingalls was appointed the Chapter 7 Trustee.

54.  On April 4, 2007, the court held a hearing on Debtor's Motion to Determine Deficiency Claim.  At that hearing, the Court ruled that the claim of Fire Eagle against the estate, based upon the secured claim it obtained from ABT, was disallowed in full inasmuch as it was fully paid by the credit bid of Fire Eagle made to purchase Debtor's property.  A transcript of this hearing is docket entry 430 in the Bankruptcy Case.

55.  On September 27, 2007, the Court signed and docketed its Amended Final Order Granting Debtor's Motion to Determine Deficiency Claim Held by Fire Eagle and Objection to Claim.  In this Order, the Court "Ordered that Fire Eagle has no deficiency claim under the First Lien Debt against the Debtor's Estate as Fire Eagle credit bid in the full amount due under the First Lien Debt plus an additional $538,437.05 pursuant to 11 U.S.C. §363(k) in order to buy the property securing the First Lien Debt at a sale of such property held in open Court."  This Order is docket entry 469 in the Bankruptcy Case.

56. Simply stated:

A) ABT first loaned $7,200,000.00 and later $900,000.00 to the Debtor secured by a first lien against virtually all the assets of the Debtor; Fire Eagle loaned $4,100,000.00 to the Debtor secured by a second and inferior lien on virtually all the assets owned by the Debtor; SIG, as of the Petition date, was the owner of a certificate of deposit in the amount of $1,200,000.00 that was pledged against the first lien indebtedness of ABT; Gurasich, Walden, West, and the Topfers had guaranteed certain differing amounts of the first lien indebtedness to ABT pursuant to certain Limited Guaranty Agreements (hereinafter "Guaranty Agreements" or "Guarantees"); and Fire Eagle held no guarantees of its second lien indebtedness from said persons and held no certificate of deposit from SIG to secure its second lien indebtedness.

B) Fire Eagle purchased the first lien indebtedness and all its collateral position from ABT effective October 6, 2006.[2] It was agreed as between ABT and Fire Eagle that the outstanding indebtedness on the first note held by ABT as of September 26, 2006 was $8,174,585.70 and that the outstanding indebtedness on the second note as of September 26, 2006 was $949,032.05. Fire Eagle paid those sums to ABT plus accrued interest on the first note of $1,896.70 per day and on the second note of $225.50 per day as of

---

[2]The transferability of the SIG CD due to the notation thereon that it is "NON TRANSFERABLE-NON NEGOTIABLE" is not an issue in the instant Motion; however, it raises questions on the ability of Fire Eagle to be a bona fide holder of the CD since it is a non-negotiable instrument.

18

the date of the purchase. Therefore, we know for certain that Fire Eagle paid ABT $9,123,618.60 plus accrued interest from September 26, 2006 until the date of closing (the effective date of the sale is October 6, 2006), plus further additional attorney's fees and expenses that might be later incurred with regard thereto to purchase the first lien debt and all that secured it.

C) On November 30, 2006, the Court held the sale in open court. At the hearing the Court accepted as the winning bid that of Fire Eagle, a credit bid of $9,300,000.00. The immediately preceding bid was a bid by an entity that had been formed by certain of the insiders of the Debtor, who are some of the guarantors of the first lien indebtedness to ABT then held by Fire Eagle ("Falcon Golf Course Partners, Ltd.") which included Gurasich, Walden, West, Alan Topfer and Richard Topfer. That bid was for cash and in the amount of $9,200,000.00. Accordingly, it is an indisputable fact that had Fire Eagle not bid $9,300,000.00 as a credit bid against the secured indebtednesses it held, it would have received cash in the amount of $9,200,000.00 which it would have had to apply first to the first lien indebtedness it had purchased from ABT and then against its second lien indebtedness to the extent of any excess proceeds.

D) In addition, in October 2006, after it had purchased the first lien indebtedness of ABT, and pursuant to an Order previously entered authorizing payment to ABT of cash collateral in the amount of $500,000.00, Fire Eagle received a payment from the Debtor of

$500,000.00 in cash collateral that could only have been applied against the first lien indebtedness it had purchased from ABT. This is because it was paid pursuant to a prior Order of this Court that required such payment to be applied against the principal of the first lien indebtedness it then held. Even though the payment was made after Fire Eagle bought the first lien debt from ABT, it nevertheless was required to be applied in accordance with the Court Order authorizing its payment.

E)  Therefore, it is without genuine dispute that Fire Eagle purchased the first lien indebtedness from ABT effective October 6, 2006 for the amount of $9,123,618.60, plus  accrued interest and attorney fees thereon from September 26, 2006 to date of purchase. We also know that interest continued to accrue on the first lien indebtedness until  the auction sale in open Court on November 30, 2006.  We know the per diem for the accrual of such interest totaled a minimum of $2,122.20 per day [estimate 60 days to November 30, 2006 = $127,332.00.] Adding this amount to the amount of the debt as of November 30, 2006 results in a total of $9,250,950.60.  Some additional attorneys fees must no doubt be added to that sum [such amount is currently unknown].  We also know that Fire Eagle received $500,000.00 in cash collateral which according to then existing Court orders had to be applied against the first lien indebtedness it had purchased.

F)  Therefore, we know that as of November 30, 2006, Fire

20

Eagle was required to credit the Senior Loan with a total of $9,800,000.00 ($500,000.00 cash collateral payment plus $9,300,000.00 credit bid) with the overage of approximately $500,000.00 plus going against its second lien debt.

G)  On virtually the same facts, this Court on September 27, 2007, entered its Amended Final Order determining that Fire Eagle had no deficiency claim against this estate under the first lien indebtedness it had obtained from ABT.

## Issue

The substantive question posed by this adversary proceeding is whether there is some magical way that 1) the Senior Loan of ABT acquired by Fire Eagle still exists; 2)  if so, in what amount; and 3) if not, if it can once again be paid by requiring application of the $1.2 million certificate of deposit which SIG claims it owns and by requiring performance of the Guarantees of the Senior Loan by Gurasich, Walden, West and the Topfers (hereinafter referred to collectively as "Guarantors").

## Legal Analysis

Under the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7056, a party will prevail on a motion for summary judgment when, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catratt,* 477 U.S. 317, 322,

21

106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986); Fed. R. Civ. P. 56(c). In order to prevail, the movant must demonstrate all elements of the cause of action, but once that burden is established the opposing party must set forth specific facts showing there is a genuine issue for trial. *R.E.Cruise, Inc., v. Bruggeman,* 508 F.2d 415, 416 (6th Cir. 1975); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986). Inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matushita v. Zenith Radio Corp.,* 475 U.S. 574, 586-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also In re Bell,* 181 B.R. 311 (Bankr. N.D. Ohio 1995). Conclusory allegations, however, will not establish an issue of fact sufficient to defeat summary judgment. *Wilson Indus., Inc. v. Aviva America, Inc.,* 185 F3d 492, 494 (5th Cir. 1999).

In cases such as this, where the parties have filed cross-motions for summary judgment, the Court must consider each motion separately, since each party, as a movant for summary judgment, bears the burden to establish the nonexistence of genuine issues of material fact, and that party's entitlement to judgment as a matter of law. Thus, the fact that both parties simultaneously argue that there is no genuine factual issues does not in itself establish that a trial is unnecessary, and the fact that one party has failed to sustain its burden under Rule 56 does not automatically entitle the opposing party to summary judgment. Wright, A. Miller, E.

Cooper, 10A Federal Practice and Procedure §2720 at 16-17 (1983). However, in the cross motion context, a lighter burden is imposed upon the party who does not face the burden of proof at trial, because it need only point to the insufficiency of the evidence to prevail on a summary judgment motion as opposed to having to establish that all the elements of its cause of action are met. *T.W. Electrical Service, Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987) citing *Celotex Corp. v. Catratt*, 477 U.S. 317, 323 (1986).

Fire Eagle first argues in its Response to the Plaintiffs' Motion for Summary Judgment that genuine issues of material fact exist claiming Plaintiffs' relief requires a determination of the parties' intent with respect to the meaning of the transactional documents and certain Orders entered by this Court and that testimony is necessary to interpret any ambiguity. However, these writings are unambiguous. And, both Plaintiffs' and Fire Eagle's Motions for Summary Judgment actually rely on them as such. Both sides also urge that its interpretation of such documents and Orders is clear and unambiguous. The summary judgment motions therefore require only a review of the transactional documents and the Bankruptcy Court Orders and their application within the context of a bankruptcy case and more specifically a §363 sale of assets within that case. No inquiry as to the intent behind them is either required or appropriate.

1. **Plaintiff's Contentions**

Plaintiffs move for a partial summary judgment on the basis that the Senior Loan has been fully paid in full and that Fire Eagle, therefore, has no claim to the SIG CD and no claim against the Guarantors.[3]

## 2. **Fire Eagle's Contentions**

Fire Eagle, on the other hand, in its Motion for Summary Judgment, claims that the Bankruptcy Code, specifically §363(k), as well as provisions of the Guaranty Agreements, do not allow for extinguishment of the Senior Loan because Fire Eagle's bankruptcy claim is somehow different from the Senior Loan it purchased from ABT. As such, the Senior Loan cannot be reduced, discharged or released because of any offset or any discharge that occurred in the Bankruptcy Case. Fire Eagle further urges that the September 6, 2005 First Amended Agreed Final Order Authorizing Use of Cash Collateral and the Agreed Order Approving Sale of Assets Pursuant to 11 U.S.C. §363(f) (the "Court Orders") 1) prevent extinguishment of the Guarantees as these Court Orders approved the assignment of the Senior Loan Documents and determined such to be valid and enforceable when purchased by Fire Eagle, and 2) as they are final and nonappealable, they cannon be collaterally attacked.

Fire Eagle also claims in its Motion for Summary Judgment and its Response to Plaintiffs' Motion for Summary Judgment that 1) the Guarantors are estopped (by silence) from claiming

---

[3]Plaintiffs' Complaint also requests attorney fees based on the declaratory relief requested in its summary judgment motion as well as damages and attorneys fees for breach of contract making this a motion for partial summary judgment.

24

extinguishment of their Guarantees because they did not notice Fire Eagle of such intention to extinguish such at the sale of the assets; 2) the Guarantors are quasi-estopped based on Fire Eagle's belief that the Guarantors agreed to pay the Guarantees and now have taken a position inconsistent with their Guaranty Agreements; 3) Fire Eagle did not intend to release the Guarantors based on the sale of assets in Bankruptcy Court and if it had known such was the intention it would not have bid; and 4) Guarantors did not provide notice of their intent to extinguish the Guarantees at the sale and such violated Fire Eagle's due process.  These are conclusory allegations, statements and bare legal arguments with no facts or evidence, legal or otherwise, put in the record by Fire Eagle to support its contentions.  Therefore, these claims do not establish any issues of fact sufficient to defeat summary judgment.

Fire Eagle, in its own Motion agrees that the ultimate issue revolves around the Senior Loan Documents and Court Orders and that no genuine issues of material fact exist.  Additionally, no notice was required by the Guarantors as to their intentions with respect to the bidding process just as there was no notice required by Fire Eagle with respect to its bid.  Further, the Guarantors did not directly participate in the bidding.  Fire Eagle's competition in bidding was a legal entity formed by some, but not all, of the Guarantors for the purpose of buying the estate property that was being sold.  And, one did not have to be Houdini to understand why this happened.  In any event, either side's intention is

irrelevant.

### 3.  Court's Substantive Conclusions

Fire Eagle takes the position that the Guaranty Agreements, the Senior Loan Documents, the Court Orders and the Bankruptcy Code actually result in summary judgment in favor of Fire Eagle.  Fire Eagle appears to be confused regarding the meaning of a §363(k) sale.  11 U.S.C. §363(k) states:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise, the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. §363(k)

Fire Eagle urges that the debt was not paid but that only Fire Eagle's "bankruptcy" claim was reduced–and only as to the Debtor. Fire Eagle argues that the clear reading of the statute–"such holder may offset such claim" supports its position.  Since the third party Guarantors were not involved in this application of offset, the credit bid does not reduce the actual debt, but merely reduces the claim.  This makes no sense.  And, Fire Eagle cites no precedent for its position.  No where does §363(k) indicate that an offset under that section does not reduce the debt.  Fire Eagle purchased the assets by bidding a $9.3 million offset[4] against the

---

[4]It should be remembered at this point that the immediately preceding bid by the insider controlled third party entity was for $9,200,000.00 cash.  Fire Eagle, therefore, chose the property at a $9,300,000.00 bid against its debt over $9,200,000.00 cash, which would have clearly paid in full the Senior Loan it held as well.  Fire Eagle seeks to have its cake, while also eating it.  The law does not so provide.

claim it held: first, the Senior Loan, and second, the debt it held as the Junior Lender.  Fire Eagle's claim is also its debt.  "Debt" is defined as liability on a claim.  11 U.S.C. §101(12).  "Claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  11 U.S.C. §101(5(A).  Payment against the claim necessarily reduces the debt.  It cannot reduce one and not the other.  This is the bankruptcy court; not fantasy land.

Fire Eagle's purchase of the SDG assets by credit bid of $9.3 million is the equivalent of a cash purchase. *Lexington Coal Co., LLC v. Miller, Buckfire, Lewis Ying & Co., LLC (In re HNRC Dissolution Co.),* 340 B.R. 818, 824-25 (Bankr. E.D. Ky. 2006); *see also McClure v. Casa Claire Apartments, Ltd.,* 560 S.W.2d 457, 461 (Tex. Civ. App.-Beaumont 1977 no writ).  The *Lexington Coal* court stated:

> "[c]learly 11 USC §363(k) treats credit bids as a method of payment-the same as if the secured creditor has paid cash and then immediately reclaimed that cash in payment of the secured debt.  In this case, the credit bid was consistently treated as payment."

340 B.R. at 824-25.  Fire Eagle credit bid the full amount of the Senior Loan and then some.  *See In re Whittemore,* 37 B.R. 93, 94 (Bankr. D. Ore. 1984)(holding proceeds from sale of debtor's property should be applied toward liens in order of their priority); *Union Central Life Ins. Co. v. Austin,* 52 S.W.2d 536, 538-39 (Tex. Civ. App.-El Paso writ ref'd)(holding $759.47 payment

27

on $4,000.00 note given as renewal of two notes was properly applied toward senior secured note); *Marshall v. G.A. Stowers Furniture Co.,* 167 S.W. 230, 231 (Tex. Civ. App. –San Antonio 1914, no writ)(holding debt payments should be applied to senior mortgage).

Fire Eagle claims these state foreclosure cases don't apply in a §363(k) bid context alleging that a bankruptcy sale in which the creditor bids against his debt to purchase the property secured by that debt is somehow different from that same event when it occurs in a foreclosure on the courthouse steps under state law. However, Fire Eagle cannot, and does not, tell us what that difference is. Perhaps that is because there is no difference. In both situations the "credit bid" is required to be applied against the debt. And, to the extent the debt is reduced in the process, so is any outstanding liability on such debt. One cannot waive payment as a defense, and a credit bid by the secured lender, whether in the context of state law foreclosure or of a §363(k) bid, is payment on the debt. It can, in fact, be nothing else.

A lender's full credit bid will prevent pursuit of additional collateral. *Bank of America v. Quackenbush,* 56 Cal. App. 4th 1167 (Court of Appeal, 4th Dist. Div. 3 1997)(Lender's full credit bid at nonjudicial foreclosure sale conclusively establishes value of the property, extinguishes lien, and precludes lender from pursuing any other remedy based on diminution of value in property); *Oklahoma P.A.C. First Limited Partnership v. Metropolitan Mortgage*

28

& *Securities Co., Inc., (In re Oklahoma P.A.C. First Limited Partnership),* 168 B.R. 212 (Bankr. D. Ariz. 1993)(deed of trust holders who credit bid full amount of indebtedness then due and owing on promissory notes and deeds of trust had to be regarded as "paid in full" and could not recover from additional property securing deed of trust loans).

Fire Eagle further relies on Section 1.5 of the Guaranty Agreements, which provides that the Senior Loan is not "reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party..."

"Setoff is the doctrine of bringing into the presence of each of the obligations of A to B and B to A, and by the judicial action of the court making each obligation extinguish the other.'" *Bellair, Inc., v. Availl of Texas, Inc.,* 819 S.W. 2d 895, 899 (Tex. App.–Dallas 1991, writ denied)(quoting *Nalle v. Harrell,* 12 S.W.2d 550, 551 (Tex. 1939). The aim of an offset or setoff is to adjust the indebtedness between the parties. *Id.* The doctrine allows parties that owe each other money to apply their debts to each other, and applies where there are mutual debts arising from different transactions. *See Sommers v. Concepcion,* 20 S.w.3d 27, 35 (Tex. App.–Houston [14[th] Dist.] 2000, pet. denied). Here, there is no debt to offset or reduce between Fire Eagle and the Guarantors. Fire Eagle was paid its Senior Loan when it credit bid in full to buy the property secured thereby. Clearly, payment on

29

a debt reduces the liability of a guarantor of that debt.

Fire Eagle also relies on the Guaranty Agreements Section 1.10 which provides that a "discharge" in bankruptcy will not release the Guarantors of their obligations. A discharge is simply a release of a debtor's personal liability for the debt; it does not erase the debt itself. *See Mahoney v. Washington Mutual Card Services, Inc. (In re Mahoney),* 368 B.R. 579, 584 (Bankr. W.D. Tex. 2007)("Bankruptcy does not erase debt; the discharge is only an injunction against attempts to collect the debt as personal liability of the debtor."); *In re Craig,* 325 B.R. 804, 806 (Bankr. N.D. Iowa 2005)(recognizing that discharge does not extinguish the debt itself, but merely releases the debtor from personal liability). A discharge in bankruptcy is neither a payment nor an extinguishment of a debt. *See Hageman/Fritz Byrne, Head & Harrison, L.L.P. v. Luth,* 150 S.W. 3d 617, 625 (Tex. App.-Austin 2004, no pet.). Here, the Senior Loan was not discharged in the bankruptcy case. No discharge has been entered; nor will one be. See 11 U.S.C. §727(a)(1). The Senior Loan was paid when Fire Eagle credit bid more than the amount that was owed thereon.

Fire Eagle's basic argument is that the Guaranty Agreements provide that bankruptcy will have no effect on the Guarantees.

> 1.10 <u>Effect of Bankruptcy.</u> ..."It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be <u>discharged</u> except by Guarantor's performance of such obligations and then only to the extent of such performance."

(Emphasis added). This provision is irrelevant to the issue at

30

hand.  The Senior Loan was not "discharged"; it was "PAID".

Furthermore, Fire Eagle fails to cite to Section 2.13 of the Guaranty Agreements which state:

> 2.13 <u>Other Actions Taken or Omitted</u>.  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Debt, or the security and collateral therefore, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Debt pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Debt when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, <u>which obligation shall be deemed satisfied only upon full and final payment and satisfaction of the Guaranteed Debt</u>.

(Emphasis Added.)  The "Guaranteed Debt" as defined in the Guaranty Agreement was fully satisfied by full and final payment thanks to Fire Eagle's $9.3 million credit bid.  Fire Eagle could have accepted the opposing party's bid for $9.2 million cash.  If Fire Eagle had received cash, the "Guaranteed Debt" would have been paid.  Fire Eagle would not have retained the right to a double recovery against the Guarantors and the SIG CD. Fire Eagle chose instead to credit bid the Senior Loan debt in full.  The result vis-a-vis the Guarantors and the SIG CD is the same in either event.

Fire Eagle also relies on the September 6, 2005 First Amended Agreed Final Order Authorizing Use of Cash Collateral ("Cash Collateral Order") claiming that such order indicated that the Guaranty Agreements are "genuine, valid, existing and legally enforceable."  The Cash Collateral Order merely held that the related loan documents were valid and enforceable.  It did not hold

31

that once the Senior Loan was paid in full, that its holder could still collect on the Guarantees or against the SIG CD. It is fairly basic law that one is only entitled to be paid its indebtedness "ONCE". Fire Eagle also relies on the Agreed Order Approving Sale of Assets Pursuant to 11 U.S.C. §363(f) (the "Sale Order") claiming the sale assets included the Guarantees. There is no doubt that the Sale Order included the sale of the Guarantees. But the Sale Order does not control the effectiveness or enforceability of those Guarantees in the face of payment of the underlying debt. Once the "Guaranteed Debt" was paid in full, the Guarantees were extinguished.

Fire Eagle attempts to argue that these Court Orders were final and nonappealable, and therefore no modification can be asserted by Plaintiffs. Fire Eagle fails to understand that the Orders merely approved the transfer of the Guarantees and acknowledged they were valid and enforceable documents as written. The Court Orders did not guaranty the enforcement or non-enforcement of the Guarantees even when the underlying debt is paid. The Guarantees are the operative documents that control the actions between Fire Eagle and the Guarantors. When the Senior Loan was paid, the guarantee liability was EXTINGUISHED.

Payment is the satisfaction of an obligation in whole or in part by "the actual constructive delivery of money or its equivalent, by the obligor or someone for him to the obligee for

the purpose of extinguishing the obligation in whole or in part and the acceptance as such by the obligee." *Gillman v. Phillips Petroleum Co.,* 601 S.W. 2d 513, 515 (Tex. App.–Amarillo 1980, no writ)(citing 60 AM. JR.2d *Payments* §1(1972).  By its credit bid, Fire Eagle paid the Senior Loan in full.  The Court does not know how to say it any other way.

Once a debt has been paid, property pledged to secure the indebtedness must be returned to the pledgor.  *See Cecil v. Wise,* 109 S.W. 2d 214, 216 (Tex. Civ. App.–Eastland 1937, writ ref'd)(holding that where sale of property by bankruptcy trustee fully paid indebtedness secured by pledgor's notes, pledgor was entitled to return of notes.); *Vaughn v. Central State Bank,* 27 S.W.2d 1112, 1114 (Tex. Civ. App.–Dallas 1930, no writ)("When however the principal debt has been paid or property tender made, the property (the pledge) is discharged of the incumbrance [sic], and the pledgor or his assignee is entitled to the return of the property pledged, or to retain the same if already in his possession.")(quoting 21 C.J 680 §41).  Consistent with this legal principle, the SIG Assignment provides that the CD shall be released to SIG once the Senior Loan has been paid.  Because Fire Eagle's $9.3 million credit bid satisfied the underlying debt secured by the SIG CD, Fire Eagle does not have a valid claim to the SIG CD.

Fire Eagle is also unable to recover against the Guarantors.

33

In order for a creditor to recover on a promissory note through a guaranty, the creditor must prove (1) the existence of the note and guaranty, (2) the debtor signed the guaranty, (3) the plaintiff legally owned or held the guaranty and (4) that a certain balance remains due and owing. *See Vaughn v. DAP Financial Services, Inc.,* 982 S.W.2d 1, 4 (Tex. App.–Houston [1st Dist.] 1997, no writ). The Guarantees in the case provide that they secure the "payment and performance of the Guaranteed Debt." The "Guaranteed Debt" is the Senior Loan identified in the assignments to Fire Eagle, and that debt was fully paid through Fire Eagle's credit bid purchase of the Debtor's assets. Because the Senior Loan has been paid in full and the debt extinguished, there is no balance due and remaining by the Guarantors on their Guarantees.

### Conclusion

Fire Eagle's Senior Loan was paid in full. As such Fire Eagle has no claim either against the SIG CD or the Guarantors under their respective Guarantees. Fire Eagle's feigned ability to not understand the Court's reasoning falls on deaf ears. This is not rocket science. The Senior Loan has been PAID!!!!!

###